IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Regina G.,** : | |
| **Plaintiff,** : | |
| | Case No. 2:22-cv-01423-TPK |
| vs. : | |
| : | **Magistrate Judge Kemp** |
| **Commissioner of** | |
| **Social Security,** : | |
| **Defendant.** : | |

**OPINION AND ORDER**

This social security disability case has a lengthy procedural history, and is now before this Court for the third time by way of Plaintiff's Statement of Errors (Doc. 13), having twice been remanded for further administrative proceedings. Plaintiff's application for benefits, originally filed on March 5, 2011 and alleging disability beginning on May 15, 2003, was, after two previous denials, again denied by way of a decision from an Administrative Law Judge issued on November 20, 2020. For the following reasons, the Court will **OVERRULE** Plaintiff's statement of errors and will **DIRECT** the Clerk to enter judgment in favor of the Defendant.

**I. INTRODUCTION**

The history of this case up to the date of the second remand order is set out in detail in the Court's previous rulings and will not be repeated here. *See Grenauer v. Comm'r of Social Security*, 2016 WL 25981(S.D. Ohio Jan. 4, 2016), *adopted and affirmed* 2016 WL 319865 (S.D. Ohio Jan. 25, 2016); *Grenauer v. Comm'r of Social Security*, 2019 WL 6798916 (S.D. Ohio Dec. 13, 2019), *report and recommendation not adopted* 2020 WL 9849788 (S.D. Ohio Mar. 26, 2020). In the last of these orders, the Court agreed with Plaintiff that the Commissioner had improperly discounted the opinion of a treating source, Dr. Mysiw, who had concluded that Plaintiff had limitations which were inconsistent with the ability to work. The case was remanded for further proceedings as to that issue.

Following that remand, an ALJ held an administrative hearing (the third one to be held in this case) on November 5, 2020. Both Plaintiff and a vocational expert, George Coleman, testified at the hearing. Following the hearing, on November 20, 2020, the ALJ issued an unfavorable decision, the details of which are as follows.

First, the ALJ found that Plaintiff last met the insured status requirements of the Social

Security Act on December 31, 2005, for disability insurance benefits, and on December 31, 2010 for Medicare Qualified Government Employee benefits (the actual finding of fact at Tr. 1725 states that the latter date is December 31, 2020, but that is a typographical error). He next concluded that she had, during the relevant time period, not engaged in substantial gainful activity, and that she had severe impairments including traumatic brain injury, cognitive disorder, seizure disorder, depression, and history of alcohol abuse. None of these impairments, taken singly or in combination, met or medically equaled the severity of an impairment described in the Listing of Impairments, however.

Moving to the next step of the process, the ALJ found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but that she had a number of nonexertional limitations and was restricted to the performance of simple, repetitive tasks in a relatively static environment characterized by infrequent changes in duties or processes, not involving a fast assembly-line pace, strict production quotas, or more than occasional contact with co-workers and supervisors and without any public contact (essentially the same finding made in the previous administrative decision, except that, in that decision, the ALJ also limited her to maintaining attention and concentration for two-hour segments, *see* Tr. 1376). These limitations precluded her from performing her past relevant work as an attorney, but she could still do jobs like linen room attendant and kitchen worker. As a result, the ALJ determined that she was not entitled to benefits.

In her statement of errors, Plaintiff raises five issues. She contends that the ALJ erred in his evaluation of the treating source opinion, erred in his evaluation of the Listing of Impairments, did not account for the full range of her impairments in the residual functional capacity determination, did not properly evaluate her credibility, and failed to comply with the remand order from the Appeals Council.

## II. STANDARD OF REVIEW

As this Court said in *Jeter v. Comm'r of Soc. Sec. Admin.*, 2020 WL 5587115, at *1–2 (S.D. Ohio Sept. 18, 2020)**,**

> Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.' " *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of*

*Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers,* 582 F.3d at 651 [quotations and citations omitted].

### III. FACTUAL BACKGROUND

#### A. Hearing Testimony

In the Court's first decision, Plaintiff's testimony at the first administrative hearing was summarized as follows (with citations to the record omitted):

Plaintiff testified at the administrative hearing that, after her injury [which occurred as a result of a fall], she attempted to return to work as a prosecutor part-time. She experienced her first seizure within one week and found it impossible to read paperwork. She also worked briefly as a part-time bartender in 2004 and 2005 following her injury, but could not make mixed drinks and was unable to give correct change. She stopped working as a bartender when her seizures became worse.

Trileptal helped for a while but her seizures returned after about a year. She continues to experience seizures at least once or twice per month. After a seizure, she experiences headaches and fatigue and has difficulty speaking, although the severity of these effects varies with the severity of the seizure. After experiencing a seizure, she must remain in bed for two days; walking, even to the bathroom, is difficult. She relies on others to help her. If she experiences smaller seizures, she is unaware of what is going on around her and will find blood around her mouth. Following these smaller seizures, she experiences fatigue and headache.

Since her injury, she has been unable to read and write. She has difficulty with her memory. For example, she has lost all memory of her childhood. She becomes tired and has difficulty understanding words. Speaking is easier than reading and writing, but she forgets even common words. She has difficulty focusing on even simple television shows. She is able to perform such household tasks as laundry.

> Friends assist her with more difficult tasks, such as handling bills.
>
> Since her injury, plaintiff has also experienced double vision, which lasts for one or two hours at a time. She also experiences tremors in her hands and legs.
>
> Plaintiff testified that, because she cannot work at any job, she also experiences depression. She underwent treatment for alcoholism, and denied any current use of alcohol or other substance abuse.

*Grenauer v. Comm'r of Soc. Sec.*, 2016 WL 25981, at *3–4 (S.D. Ohio Jan. 4, 2016). In the 2019 Report and Recommendation, the Court added that

> [a]fter the case was remanded, Plaintiff testified at another hearing on September 19, 2016 before ALJ Yerian. Plaintiff reported that, since the previous hearing in May 2013, she has not had any significant changes in her medical condition. She indicated that she is still experiencing seizures but has switched to a different medication. She reported experiencing seizures about once per week. Plaintiff described that "[t]hey put [her] out for about three days." She continued to have difficulty reading. She denied any use of alcohol or marijuana.

*Grenauer v. Comm'r of Soc. Sec.*, 2019 WL 6798916, at *2 (S.D. Ohio Dec. 13, 2019) (record citations omitted). At the third hearing, held before ALJ Kelly, Plaintiff reiterated that she had difficulty reading and comprehending written material and that she was able only to write her name and address. Shortly after her fall, she experienced grand mal seizures several times per week, but by the time that hearing was held, the frequency had lessened to once every week or two. Additionally, during the relevant time she had serious memory deficits and would experience headaches after having a seizure.

George Coleman, the vocational expert who testified at the third hearing, first said that Plaintiff's past work as reflected in the record was skilled and performed at the light exertional level. He was then asked questions about a person with Plaintiff's vocational profile who was, among other things, limited to simple, repetitive tasks to be performed in a relatively static work environment with limited contact with others in the workplace and no contact with the public. Mr. Coleman testified that such a person could not do Plaintiff's past work, but could perform jobs like linen room attendant and kitchen helper, which are both unskilled, medium jobs. He also said that various limitations would be work-preclusive, such as being unable to perform simple, repetitive tasks; missing two days of work per month; needing to be redirected frequently; and being off task for more than 10% to 12% of the workday.

### B. Relevant Medical Records

The Court's prior decisions also provide an extensive summary of the pertinent medical records, which are primarily those either predating the expiration of Plaintiff's insured status or relating back to that time period. The January 4, 2016 Report and Recommendation provides the

most complete summary. There, the Court said:

> On May 16, 2003, plaintiff suffered a severe traumatic brain injury as a result of a fall down stairs in her home. CT scans at the time of her injury revealed a subarachnoid hemorrhage in the foramen magnum, basilar skull fracture, and bilateral frontal contusions. Following her initial hospitalization, plaintiff underwent inpatient rehabilitation until June 6, 2003, and then outpatient rehabilitation at the Neurological Rehabilitation Program at the Northeast Health Center.
>
> Plaintiff began treating with Deidre D. Redd, M.D., a rehabilitation specialist, in May 2003. In February 2004, Dr. Redd diagnosed plaintiff with a traumatic brain injury, resulting in a seizure disorder and problems in communication. According to Dr. Redd, plaintiff's injuries rendered her unable "to effectively work as an attorney. It is my opinion she is, at this time, permanently disabled to perform her duties."
>
> Plaintiff was examined by Ken Bain, Ph.D., a neuropsychologist, in November 2003 upon referral by Dr. Redd. On testing, plaintiff achieved a verbal IQ score of 92 (30th percentile), a performance IQ score of 104 (61st percentile), and a full-scale IQ score of 97 (42nd percentile). Dr. Bain noted a severe problem with dysnomia and a significant reading disability as a result of the injury. Dr. Bain diagnosed organic personality syndrome, secondary to traumatic brain injury, and a reading disorder, secondary to traumatic brain injury. According to Dr. Bain, plaintiff's "cognitive and neurobehavioral deficits were obstacles to the performance of her job duties."
>
> Plaintiff presented to William E. Carroll, M.D., a neurologist, for evaluation of her seizures on February 5, 2004. Dr. Carroll concluded that her seizures were not under control and advised that she maximize her Trileptal treatment.
>
> Leslie A. Friedman, M.D., a neurologist, consultatively evaluated plaintiff on April 7, 2004, at the request of the state pension system. Plaintiff reported various cognitive difficulties and intermittent seizures. On examination, plaintiff was alert, oriented, and appropriate. Dr. Friedman noted some degree of cognitive and language dysfunction. Based on his examination and a review of her history, medical records, and current complaints, Dr. Friedman opined, "Noting [plaintiff's] previous employment as an attorney and noting the obvious cognitive demands of an attorney, it becomes quite apparent that she can no longer function at this level."
>
> On August 23, 2005, Marjorie C. Gallagher, M.D., completed a psychiatric evaluation for the state pension system. Dr. Gallagher reported that plaintiff had experienced grand mal seizures at least once per week until she was stabilized

with medication during the summer of 2004. Plaintiff's only seizure since that time occurred in December 2004 when she forgot to take her medication. Plaintiff reported that she had begun psychiatric treatment and psychotherapy five years earlier, and last saw a psychiatrist seven months earlier. She continued with counseling once per week, although she reported that she "is not getting anywhere." Plaintiff also reported a history of alcohol abuse but denied current abuse. Dr. Gallagher diagnosed dementia due to head trauma, depressive disorder, NOS, and alcohol dependence in full sustained remission. Dr. Gallagher reported that plaintiff's documented disturbance in executive functioning would significantly impact her ability to work effectively as an attorney. Considering the severity and refractory nature of plaintiff's dementia, Dr. Gallagher opined, plaintiff remained disabled and unable to work as an attorney.

On February 19, 2007, James Youngman, M.D., completed a psychiatric evaluation for the state pension system. Plaintiff reported that her mood remained depressed and that having to negotiate stairs triggered episodes of post-traumatic stress disorder. Plaintiff denied suicidal or homicidal ideation. Dr. Youngman diagnosed a mood disorder due to a closed head injury. According to Dr. Youngman, plaintiff was presently disabled from a psychiatric point of view and could (sic) return to her position as a prosecuting attorney.

On April 21, 2008, Robert M. Hess, M.D., performed a consultative examination of plaintiff. Clinical examination revealed continued "intellectual dysfunction." Dr. Hess agreed with Dr. Youngman's diagnoses of a mood disorder secondary to closed head injury as well as closed head injury with history of subarachnoid hemorrhage and basilar skull fracture and frontal contusion seizure disorder. Based upon plaintiff's reports of persistent seizures, difficulty with cognition, and intellectual function, Dr. Hess opined that plaintiff "is disabled."

Talya Greathouse, M.D., plaintiff's primary care physician, performed a medical assessment and mental functioning capacity assessment on January 17, 2011. According to Dr. Greathouse, plaintiff was moderately limited in her ability to push/pull and bend; she was not significantly limited in her ability to see; and she had no limitations in her ability to reach, handle, engage in repetitive foot movements, and in her ability to hear and speak. Plaintiff was extremely limited in her ability to remember locations and work-like procedures and to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was moderately limited in her ability to understand and remember detailed instructions, to carry out very short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to respond appropriately to changes in the work setting, to be aware

of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation. Plaintiff's "significant cognitive dysfunction" included limitations in speech and reading. Dr. Greathouse diagnosed closed head trauma, seizures, depression/anxiety, and alcoholism.

On September 28, 2012, W. Jerry Mysiw, M.D., Medical Director of the Dodd Hall and Head Trauma Rehabilitation Services, reported the following:

> I have been following Ms. Grenauer since 8/31/11, for a Traumatic Brain Injury she sustained in May, 2003. Secondary to her traumatic brain injury she has chronic headache, anxiety, personality changes, binocular vision deficits, seizure, fatigue, cognitive impairments and depression. Future visits will be required to address her sleep, executive dysfunction, and poor frustration levels with current treatment plan consisting of medication management. I reviewed her past medical records and it is apparent that since her initial head injury she began having the identical symptoms/diagnoses that I now treat her for. To the best of my knowledge Ms. Grenauer has been permanently and totally disabled since her initial injury.
>
> I do consider Ms. Grenauer an appropriate candidate for Social Security Benefits; she certainly meets your criteria for the allowed assistance. It is my professional medical opinion that Mrs. Grenauer is considered to be totally disabled and will remain unable to retain remunerative employment.

*Grenauer v. Comm'r of Soc. Sec.*, 2016 WL 25981, at *1–3 (record citations omitted). The next set of Court decisions noted that Dr. Mysiw had written another opinion in 2016 in which he stated:

> ...Ms. Grenauer's continues to struggle with memory and attention problems. She also has problem commonly found after a frontal lobe injury in that she has diminished insight, organizational and initiation skills. Therefor[e] it is very difficult for her to manage her own home and live independently without some supervision and support. Also, she never fully regained her language skills. Her verbal expression is functional but her ability to understand complex conversations is limited. In addition she never regained reading and writing skills that are functional.
>
> Ms. Grenauer's recovery was initially compromised by continued alcohol use or abuse. That is now seemingly controlled and no longer a factor. Despite that, she has never regained the functional skills to return to work. In fact the nature of her cognition limitations, the impaired insight and impulse control, the problems she

> has with organization and task completion and the language deficits make it difficult for her to live independently without support. Her recovery is stable. She will never improve enough to sustain work related activities and she will never be fully independent.

*See Grenauer v. Comm'r of Soc. Sec.*, 2019 WL 6798916, at *2. Dr. Mysiw also completed a functional capacity assessment, concluding that

> Plaintiff was severely restricted in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or proximity to others without being distracted by them; (5) respond to customary work pressures; (6) complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and (7) respond appropriately to change in the work setting. He further opined that she was moderately severely restricted in her ability to: (1) remember locations and work-like procedures; (2) perform activities within a schedule; (3) maintain regular attendance and be punctual within customary tolerances; (4) make even simple work-related decisions; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (6) travel in unfamiliar places or use public transportation; (7) set realistic goals; and (8) make plans independently of others.

*See Grenauer v. Comm'r of Soc. Sec.*, 2020 WL 9849788, at *1 (S.D. Ohio Mar. 26, 2020) (record citations omitted). It does not appear that any additional relevant records were submitted in connection with the most recent administrative proceedings.

## IV. DISCUSSION

### A. Dr. Mysiw's Opinion

There is no dispute that the limitations set out in Dr. Mysiw's reports are work-preclusive. Plaintiff argues that the ALJ should have afforded his opinions controlling weight under the then-prevailing "treating physician" rule. *See, e.g., Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004); former 20 C.F.R. §404.1527(c). She asserts that the reasons he gave for not doing so do not have any support in the record and argues that he simply substituted his own lay interpretation of the record for that of Dr. Mysiw, something an ALJ may not do. The Commissioner responds that the ALJ correctly concluded that the notes from Dr. Carroll, reviewed by Dr. Mysiw, do not support the extreme limitations posited by Dr. Mysiw, nor do his own treatment notes nor Plaintiff's treatment history. The Commissioner also asserts that the remainder of the record supports the ALJ's view that Dr. Mysiw's opinions are inconsistent with Plaintiff's demonstrated mental abilities during the relevant time frame.

Because this issue is the subject of two prior decisions from this Court, it is important

-8-

both to recount what the Court said in those decisions and how the current administrative decision responds to the Court's directives. In its first decision, the Court noted that the ALJ's dismissal of Dr. Mysiw's opinions as not relating back to the relevant time period was factually inaccurate because Dr. Mysiw specifically said that the injury for which he was treating Plaintiff was the same injury she suffered in 2003, and that the limitations he observed had persisted since that date. In its second decision, the Court's discussion of this issue was more specific. There, the Court said this:

> The Court agrees with Plaintiff that the ALJ failed to give good reasons for discounting Plaintiff's treating physician. Instead, the ALJ seems to have based the MRFC determination on his own lay opinion of the medical evidence and cherry-picked statements from the February 2007 and April 2008 evaluations to support that lay opinion. The ALJ discounted Plaintiff's physicians' consistent opinions of "disabled" on the basis that the ultimate disability determination was for him to decide or that the physician's opinion related only to Plaintiff's ability to continue working as an attorney. But the ALJ also stated that "[t]he State Agency psychological consultants found insufficient evidence on which to make a mental assessment," and, thus, he gave no weight to their determinations. It is therefore unclear on what medical evidence the ALJ determined, for example, that Plaintiff could maintain attention and concentration for two-hour segments, and it appears to be solely his lay opinion. The Court agrees that the cherry-picked evidence from the February 2007 and April 2008 psychological evaluations do not support such a conclusion. The same is true regarding Dr. Mysiw's other opinions that were rejected in the ALJ's MRFC. This was error.

*Grenauer v. Comm'r of Soc. Sec.*, 2020 WL 9849788, at *3 (S.D. Ohio Mar. 26, 2020) (record citations omitted).

Following that remand, the current ALJ again declined to give controlling weight to Dr. Mysiw's opinions about Plaintiff's mental residual functional capacity. He reasoned that

> [t]he[] records establish that the claimant had difficulties due traumatic brain injury, resulting cognitive disorder, and depressive disorder, but they do not document symptoms or limitations that would be work preclusive. While the undersigned agrees that the claimant's impairments and resulting symptoms would preclude her ability to return to her past skilled work as an attorney, there is no evidentiary support to document that the claimant would be unable to return to the range of unskilled work detailed above. Despite the District Court's belief that the prior ALJ cherry-picked evidence to support his conclusion, the undersigned has relied on contemporaneous medical records to support the claimant's limitations at the time of her dates last insured. As noted, even soon after her TBI, the claimant's attentional capabilities were testing to be in the average range, as were her problem solving capabilities (1F). Additional improvements were expected during her recovery, and subsequent records

document that while she continued to have some impairment, her memory function was largely intact, and she admitted to being able to perform well on routine tasks, and was able to handling her own grocery shopping, cooking, and bill paying (19F, 8F, 11F, 12F). The claimant has not required inpatient psychiatric treatment, emergency room stabilization, or any continued cognitive therapy or training due to these conditions, prior to December 31, 2010. Thus, when considering the evidence of record and the "B" criteria analysis discussed above, the undersigned finds that the mental residual functional capacity assessed herein appropriately considers the claimant's allegations in conjunction with the medical evidence. Specifically, the undersigned finds the claimant retained the ability to perform simple, repetitive tasks in a relatively static environment characterized by infrequent changes in duties or processes, not involving a fast assembly-line pace, strict production quotas, or more than occasional contact with coworkers and supervisors, with no public contact.

Finally, the undersigned has considered and reviewed the opinions and various statements offered by Dr. Mysiw (31F, 44F, 42F, 45F). As this claim has been remanded twice for consideration of the opinions offered by Dr. Mysiw, the undersigned has independently reviewed and evaluated the weight afforded to his statements, but still concludes that only limited weight should be given to Dr. Mysiw's conclusions. Although the District Court concluded that the prior ALJ cherry-picked evidence to discount Dr. Mysiw's opinion, the undersigned has looked at the contemporaneous evidence at the time relevant to this decision, and notes that it is inconsistent with Dr. Mysiw's conclusions. This conclusion does not preclude the existence of more severe issues at later times, consistent with the claimant's additional head injury in 2012, but instead considers the evidence and statements prior to the claimant's dates last insured or soon thereafter. Specifically, at 42F, Dr. Mysiw completed a mental capacity form with severe categories checked as severe or moderately severe, with both of these ratings being work preclusive. Dr. Mysiw acknowledged that he was not involved with the claimant's care until August 31, 2011, but that he reviewed her prior records and maintained that they are consistent with his current findings (45F). Remarkably, although Dr. Mysiw may have later reviewed all of the claimant's prior treatment records, in 2011, the only medical records he reviewed were Dr. Carroll's notes (24F/5). However, a review of Dr. Mysiw's own early treatment records as well as the other contemporaneous medical records from the period prior to 2011, indicate that the claimant's prior records are not consistent with these severe or moderately severe restrictions. Notably, despite his statement that the claimant could not live independently without some supervision and support, his early treatment records with the claimant from 2011 and even early 2012 indicate that she was independent with activities of daily living (45F/1, 24F/5, 44F/5). It wasn't until 2016 that the claimant reported that a friend has to read her mail to her, and in 2005 and 2006, the claimant was trying to start her own business, was helping other attorneys at their offices, and stated that she was able

to do her own grocery shopping, errands, and pay her own bills (43F, 8F/2). Further, the District Court had some issues with the prior ALJ relying on the objective findings from other medical evaluations, while not giving substantial weight to their conclusions regarding the claimant's ability to return to work. However, as discussed above, conclusions on whether an individual is disabled is reserved to the Commissioner under Social Security Regulations (20 CFR 404.1527(e)). Therefore, while no weight can be given to these conclusions, the objective findings detailed within these reports must still be considered, and those findings contradict the severe limitations opined by Dr. Mysiw (11F, 12F, 42F). The claimant's performance on mental status evaluations in 2007 and 2008 is highly relevant to what restrictions were present prior to her dates last insured, and her ability to perform well on Serial 7s, perform 5 calculations without error, to have a general fund of knowledge that was above average, indicate that while the claimant had some restrictions due to her injury, that she was not as severely limited as Dr. Mysiw concluded she was, prior to 2010 (11F,12F, 42F). His conclusion that the claimant would have severe limitations in her ability to maintain attention and concentration for extended periods is inconsistent with the neuropsychological examination that was performed just a few months after the claimant's initial injury and found that her attentional capabilities were in the average range (42F, 1F/3). Similarly, his statement that the claimant would have a moderately severe limitation in her ability to remember locations and work-like procedures is in contrast to the claimant's continued ability to drive, and her ability to drive from Licking County to Westerville for an appointment without difficulty (5F/2). While Dr. Mysiw insinuates that the claimant's impairments and restrictions have remained at the same severity level from 2003 through the present, this conclusion is just not supported by the evidence of record and the claimant's limited treatment throughout much of the relevant time. As noted, the claimant did not begin seeking ongoing neurological care until late 2011, when she stated she was having an increase in seizures (22F/24). She stated that her fatigue was a new symptom related to the increase in seizure activity (24F/8). Remarkably, in early 2011 closer in time to her dates last insured, the claimant stated that she was doing great, had no anxiety or depression, and her thought process was described as linear and goal directed, with the claimant admitting that she was functioning very well and had not felt this well for a long time (14F/5). Again, while there is no doubt that the claimant is unable to return to her highly skilled past profession, the evidence of record does not support that she was as limited as opined by Dr. Mysiw prior to her dates last insured. Accordingly, the undersigned gives his various opinions and conclusions only little weight.

***

In summary, the location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors, are adequately addressed and accommodated in the above residual functional capacity. The objective evidence fails to document the presence of any impairment or

combination of impairments that could reasonably be expected to result in
pain or other symptoms of such a severity or frequency as to preclude the range of
work described above.

Unquestionably, this is a different rationale than the one from 2017 which the Court found to be deficient. There, the ALJ cited to only two prior mental status examinations as being inconsistent with Dr. Mysiw's opinions, those being the ones done by Dr. Youngman and Hess, and he did not discuss any other objective findings which supported the mental residual functional capacity determination which he made. That omission, and the fact that he relied on only certain findings from those two reports (which also concluded, based on the findings the examiners made, that Plaintiff was disabled), led the Court to surmise that the source of the ALJ's functional capacity finding was his own lay judgment.

Here, by contrast, the ALJ cited to additional portions of the record which he viewed as inconsistent with Dr. Mysiw's opinions. The earliest record he cites, an evaluation done by Dr. Gallagher in August, 2005, does indicate, as the ALJ noted, that Plaintiff could do household chores, go grocery shopping, and pay bills. She was also working two nights a week as a bartender (although the record also indicates that she was unable to continue that work due to memory or comprehension issues). The ALJ does not mention in his discussion, however, that Dr. Gallagher also reported that Plaintiff said she was depressed all the time, cried every other day, and had memory problems - which might indicate some "cherry-picking" - but Dr. Gallagher also reported objective findings including the fact that Plaintiff did not evidence any anxiety and depression and performed better than expected on every cognitive test that was administered during the examination. (Tr. 483-87). Although Dr. Gallagher also found Plaintiff to be disabled, it is clear that her opinion was limited to addressing the question of whether Plaintiff could return to her prior work as an attorney. A reasonable person could conclude that the findings made during this evaluation (which is close in time to the injury) were inconsistent with, rather than supportive of, Dr. Mysiw's opinions.

The ALJ also relied, in part, on findings from Dr. Bain's evaluation done on November 25, 2003. Dr. Bain reported that Plaintiff had returned to work for 10 hours per week doing financial and administrative work and that she was driving an automobile. She did show some emotional lability during the examination, but she performed well on intelligence testing and showed average attentional capabilities, and she also did well on memory tests except for one which he described as "difficult." She also had the ability to learn and remember simple new information, and Dr. Bain suggested that she might have to look for work in a different field given the mental demands of work as an attorney. (Tr. 317-24). Again, it is reasonable to view this evaluation as providing little support for Dr. Mysiw's views.

Another record cited by the ALJ is a report from a January, 2011 progress note from Behavioral Healthcare Partners made in connection with Plaintiff's medication management. As the ALJ noted, Plaintiff reported at that time that she "feels great and is doing great." (Tr. 541). She denied both anxiety and depression and her mood was "sunny, pleasant, and euthymic." *Id*. Her cognition was within normal limits. The note from six months before is similar, with

Plaintiff questioning whether she needed to continue her anti-depressant medication. Given that this note was made close to the time when Dr. Mysiw's first opinions were expressed, it again appears that the ALJ acted reasonably in placing some reliance on it. The ALJ also cited to notes from Plaintiff's primary care doctor, Dr. Greathouse, which show that Plaintiff's mental status examinations were consistently normal, that she was doing well on her medications, and that she was able to take care of her son.

Plaintiff does not argue that the ALJ mischaracterized any of this evidence. While she argues, generally, that the ALJ's reasoning is not supported by the record, she does not tie this argument specifically to any of the records cited by the ALJ. The Court's own review of these records, as set out above, confirms the Commissioner's contention that the ALJ had a reasonable basis for reaching the conclusion that, despite her injury, Plaintiff was not as limited as Dr. Mysiw believed her to be, at least prior to the expiration of her insured status. As a result, the Court finds no merit to Plaintiff's first claim of error.

### B. The Listing of Impairments

Plaintiff next argues that the ALJ did not properly compare her symptoms to the applicable sections of the Listing of Impairments. The ALJ considered four sections of the Listing, sections 11.02 (epilepsy), 11.18 (traumatic brain injury), 12.02 (organic mental disorders), and 12.04 (depressive disorders). Plaintiff takes issue with his analysis under two of those sections, 11.18 and 12.02, contending that the ALJ should have determined whether her symptoms satisfied the "A" criteria set out under section 12.02 (which he did not), and also that he erred by failing to conclude that she qualified for benefits under the "B" criteria. The Commissioner responds that Plaintiff is relying on a former version of the Listing of Impairments which was not applicable to the administrative decision made in 2020.

The two sections at issue here read in relevant part as follows:

**11.18 Traumatic brain injury, characterized by A or B**:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the injury.

OR

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following areas of mental functioning, persisting for at least 3 consecutive months after the injury:

    1. Understanding, remembering, or applying information (see 11.00G3b(I)); or
    2. Interacting with others (see 11.00G3b(ii)); or

-13-

    3.  Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    4.  Adapting or managing oneself (see 11.00G3b(iv)).

**12.02 Neurocognitive disorders (see 12.00B1), satisfied by A and B, or A and C:**

  A.  Medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas:
    1.  Complex attention;
    2.  Executive function;
    3.  Learning and memory;
    4.  Language;
    5.  Perceptual-motor; or
    6.  Social cognition.

AND

  B.  Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
    1.  Understand, remember, or apply information (see 12.00E1).
    2.  Interact with others (see 12.00E2).
    3.  Concentrate, persist, or maintain pace (see 12.00E3).
    4.  Adapt or manage oneself (see 12.00E4).

\*\*\*

In the challenged portion of his decision, the ALJ determined that Plaintiff did not satisfy the requirements of section 11.18 because she did not have the requisite combination of the limitations in physical functioning described in subsection A and in one of the four areas of mental functioning described in subsection B.  Similarly, he found that section 12.02 had not been satisfied because, under the "B" criteria applicable to that section (which are identical to the "B" criteria listed under section 11.18), she did not have one extreme or two marked limitations in those four areas.

The Court finds neither the Commissioner's argument nor the first part of Plaintiff's argument to have any plausible merit.  That the criteria listed in sections 11.18 and section 12.02 may now differ from those set out in the version cited by Plaintiff does not alter the fact that the ALJ did not mention the current "A" criteria under section 12.02 in his decision.  However, the fact that the section requires both the "A" and the "B" criteria (or "A" and "C") to be satisfied means, if nothing else, that if a claimant's symptoms fail under either set of criteria, the Listing has not been met.  Consequently, if the ALJ was correct in his determination about the "B" criteria, whether he did nor did not analyze the "A" criteria is of no moment.  Any error here (if there was one) is clearly harmless.  *See, e.g., Campbell v. Comm'r of Soc. Sec.,* 227 F. App'x 470, 471 (6th Cir. 2007) *(*any error committed by a social security ALJ is harmless if it is "not

substantial enough to change the outcome of the case"). The Court's discussion of this claim will therefore focus on the argument that the evidence compelled the ALJ to find that the "B" criteria were satisfied.

In support of this argument, Plaintiff asserts that "[t]he record contains voluminous treatment records, independent psychiatric evaluations and multiple third-party statements confirming the dramatic change in the Plaintiff's condition and functional status following her traumatic brain injury." Plaintiff's Memorandum, Doc. 13, at 11. These records and statements, according to Plaintiff, constitute substantial evidence that she had marked impairments in three of the four relevant areas of mental functioning. That may well be true, but the question to be answered here is not whether the record contains substantial evidence to support a conclusion different from the one reached by the ALJ, but whether his conclusions are also supported by substantial evidence. *See, e.g., McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 839–40 (6th Cir. 2006) ("the findings of an ALJ are not subject to reversal merely because there is substantial evidence in the record to support a different conclusion"). The ALJ devoted several pages of his decision to a detailed discussion of each of the four areas of mental functioning, *see* Tr. 1725-28, explaining why the evidence supported only moderate limitations in these four areas, and Plaintiff's memorandum contains no argument that the evidence upon which he relied did not support his findings. Absent an analysis of the appropriate legal issue by Plaintiff, the Court will not attempt to construct such an argument, and therefore finds that this second claim of error does not justify an order of remand.

### C. Severe Impairments

As her next claim of error, Plaintiff identifies a number of severe impairments - described in her memorandum as organic personality syndrome secondary to traumatic brain injury, a reading disorder secondary to TBI, dementia due to head trauma, and depressive and mood disorders due to closed head injury - which were not acknowledged by the ALJ. She further asserts that functional limitations from these impairments were not included in the ALJ's residual functional capacity finding. The Commissioner, in turn, argues that substantial evidence supports the ALJ's mental residual functional capacity finding and that no additional mental limitations should have been included in that finding.

The Court begins its analysis of this issue with the proposition that any error made at step two of the sequential evaluation process, where the ALJ determines which of a claimant's medically determinable impairments are severe and which are not, is harmless so long as the ALJ includes in his residual functional capacity finding any limitations which may have been caused by the nonsevere impairments. *See Meadows v. Comm'r of Soc. Sec.,* 2008 WL 4911243, at *13 (S.D. Ohio Nov. 13, 2008) ("if an ALJ errs by not including a particular impairment as an additional severe impairment in step two of his analysis, the error is harmless as long as the ALJ found at least one severe impairment, continued the sequential analysis, and ultimately addressed all of the claimant's impairments in determining his residual functional capacity"). Because the ALJ did find severe impairments here and imposed a number of mental limitations on Plaintiff's ability to function in the workplace, the relevant question is whether he erred by not finding

additional functional limitations caused by these or other impairments which Plaintiff has identified. It should also be noted, at the outset, that the ALJ did find Plaintiff's traumatic brain injury and depression to be severe impairments, so it is not clear that the conditions listed in Plaintiff's memorandum are actually separate medical impairments at all, especially the ones that are secondary to her traumatic brain injury.

As with her second claim of error, much of Plaintiff's argument is devoted to marshaling the evidence that might support a finding of additional limitations, as opposed to pointing out why the evidence relied on by the ALJ did not support the finding that he made. However, she does list the additional limitations she believes to have been improperly omitted from the residual functional capacity finding, including severe memory loss, emotional withdrawal, fatigue, and impairments in memory and concentration. But the ALJ explicitly considered the extent to which such symptoms affected Plaintiff's ability to function in the workplace, and he concluded, based on the record, that despite her memory and concentration deficits, she could still perform simple, repetitive tasks, and that, despite her emotional withdrawal, she could tolerate occasional interaction with coworkers and supervisors. He explained why the objective medical findings and expert opinions supported these findings and why opinions describing greater limitations were given lesser weight. Other than her first argument addressing the ALJ's evaluation of Dr. Mysiw's opinions (which the Court has found to lack merit), Plaintiff does not explain why the evidence relied on by the ALJ was not substantial enough to permit a reasonable person to conclude, as he did, that Plaintiff's mental limitations were only the ones contained in his mental residual functional capacity finding. The Court therefore rejects Plaintiff's third claim of error.

### D. Self-Reported Symptoms

Plaintiff's fourth claim of error takes issue with the ALJ's finding that her testimony and self-report of symptoms was not entirely consistent with the objective evidence of record. More specifically, she argues that the ALJ erroneously concluded that the record demonstrated that she made a "good recovery" from her injury, that her two failed work attempts showed that she had impairments inconsistent with work activity, and that the ALJ did not properly weigh, under SSR 96-7p, statements made by a state agency medical consultant to the effect that her report of symptoms was "fully credible." The Commissioner asserts, however, that the ALJ properly considered various items of evidence in determining that some inconsistencies existed between Plaintiff's self-reports and the objective medical findings (as well as her activities of daily living), and that Plaintiff incorrectly relies on SSR 96-7p, which has been superseded by SSR 16-3p.

Taking the last argument first, the Commissioner is correct that SSR 16-3p is the applicable ruling here. However, that ruling essentially reiterates the two-step process for determining consistency laid out in the prior ruling while eliminating the use of the word "credibility." As noted in both rulings, and as mandated by the applicable regulations and case law, an ALJ must determine (1) if a claimant's medically determinable impairments could cause the symptoms alleged, and, if so, (2) whether the evidence supports the claimant's description of

the intensity and duration of his or her symptoms. *See also, e.g., Rogers v. Comm'r of Social Security*, 486 F.3d 234, 247 (6th Cir. 2007). Like SSR 96-7p, SSR 16-3p also contains language about how an ALJ is to consider statements made by state agency reviewers, reading as follows:

> ... State agency medical and psychological consultants and other program physicians and psychologists may offer findings about the existence and severity of an individual's symptoms. We will consider these findings in evaluating the intensity, persistence, and limiting effects of the individual's symptoms. Adjudicators at the hearing level or at the Appeals Council level must consider the findings from these medical sources even though they are not bound by them.

Plaintiff, in making her argument, relies on a finding made at the state agency level (*see* Tr. 93) to the effect that her statements about the limiting effects of her impairments were fully credible, based on a conclusion that they were "consistent with the objective findings." *Id*. The Court finds this reliance to be unavailing for several reasons. First, it is not entirely clear that this statement was made by the medical consultant, Dr. McCloud, as opposed to having been made by the state agency adjudicator. Even if the statement came from Dr. McCloud, however, he was tasked with evaluating Plaintiff's physical residual functional capacity and not her mental residual functional capacity. Dr. McCloud concluded that Plaintiff could work at all exertional levels, a conclusion which the ALJ adopted, and which Plaintiff does not appear to dispute. There is no state agency consultant's opinion on the question of whether her report of psychologically-based symptoms is consistent with the objective findings. Since it is those symptoms which are the focus of Plaintiff's argument, this portion of her claim of error lacks merit.

> Turning to the more substantial part of her claim of error, it is important to remember that
>
> it is clear that a reversal of the Commissioner's decision based upon error in a credibility/consistency determination requires a particularly strong showing by a plaintiff. Like the ultimate non-disability determination, the assessment of subjective complaints must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility/consistency determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are inconsistencies and contradictions among the medical records, his testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

*Prichard v. Comm'r of Soc. Sec.*, 2020 WL 5544412, at *7 (S.D. Ohio Sept. 16, 2020).

Here, the ALJ reasoned that any claims of totally disabling psychological symptoms were

-17-

inconsistent with the evidence that Plaintiff's seizures, after they developed, were well-controlled with medication; that testing showed her attentional abilities to be in the average range; that she could remember familiar information; that she was able to drive; that she had made an attempt to start her own business; that many of her test results were normal; and that she did not seek consistent treatment for cognitive impairments until after the expiration of her insured status. The record also shows that she retained the ability to go grocery shopping, pay bills, and do household chores. *See* Tr. 1729-32. Those are all factors which an ALJ may legitimately consider, and Plaintiff has not argued otherwise. The fact that there is contrary evidence does not mean that the ALJ erred in his determination. As a result, the Court finds no error here.

### E. Compliance with the Appeals Council's Order

Plaintiff, in her final claim of error, asserts that the ALJ did not comply with the order of remand issued by the Appeals Council. That order incorporated the findings made by this Court in its 2020 decision, and directed the ALJ to re-evaluate Dr. Mysiw's opinion. Plaintiff argues that the most recent administrative decision simply repeated the errors made by the prior ALJ, again "cherry-picking" the evidence and ignoring the fact that the same records which the ALJ relied on also contained evidence supporting her claim of disability.

The Court agrees with the Commissioner that this claim of error is not substantially different from Plaintiff's argument that the ALJ failed to provide good reasons to support giving little weight to Dr. Mysiw's opinions. For the same reasons set out above, the Court finds that this argument provides no basis for ordering a remand.

### V. CONCLUSION AND ORDER

For the reasons stated above, the Court **OVERRULES** Plaintiff's statement of errors (Doc. 13) and **DIRECTS** the Clerk to enter judgment in favor of the Defendant.

                                              /s/ **Terence P. Kemp**
                                              **Terence P. Kemp**
                                              **United States Magistrate Judge**